You have requested our opinion whether a facility that provides treatment for individuals with mental disorders may accept an individual for voluntary admission at the request of a health care agent for the individual. In your letter, you point out that the law on voluntary admissions, § 10-609 of the Health-General Article,[1] provides in part that a facility may not accept an individual's voluntary admission unless the individual understands the nature of the request for admission, is able to give continuous assent for retention, and is able to ask for release. You also point out that neither a guardian of the person nor a surrogate decision maker may consent to another's in-patient psychiatric care. Finally, you ask about the legal situation if an individual who had appointed a health care agent either seeks to revoke the advance directive or objects to admission to the facility.
For the reasons stated below, we conclude as follows: A facility that provides treatment for individuals with mental disorders may accept an individual for voluntary admission at the request of a health care agent for the individual if: (1) the health care agent is acting within the scope of his or her authority under a then-effective advance directive; (2) the health care agent will monitor the circumstances of the patient's course of treatment so as to be able to exercise judgment about the patient's retention or release; and (3) the patient does not express disagreement with the voluntary admission.
 I Reconciling Voluntary Admissions and Health Care Agency
A. Voluntary Admission Criteria
In 1910, the General Assembly authorized "any institution, hospital, home or retreat for the insane" to "receive and detain therein for purposes of care and treatment . . . anyone who is desirous of submitting himself for treatment. . . ." Chapter 715, § 1, Laws of Maryland 1910, amending Article 59, § 37. This statute prohibited facilities from accepting "a voluntary patient whose mental condition is such, or becomes such, that such person cannot comprehend the act of voluntary commitment, or be able to request his or her discharge, or give continuous assent to detention."
As the Mental Hygiene Law evolved over the years, this language remained essentially unchanged. Just prior to the 1982 recodification of the law into the Health-General Article, former Article 59, § 11(a) provided that any licensed mental health facility "may admit for purposes of care or treatment, or both, any person over the age of 16 years who has any mental disorder which is susceptible of care or treatment and who requests admission to such a facility." Voluntary admission was prohibited, however, unless the patient's condition "is such that he is able to understand the nature of his request for admission, is able to request his release, and is capable of giving continuous assent to his retention by the facility." Former Article 59, § 11(b).
In 1982, when the Health-General Article was enacted, these provisions were recodified into § 10-609. The relevant language, which was said by the Revisor's Note to have been derived without substantive change from former Article 59, § 11 and which has not been amended since, is as follows:
 (a) Application for voluntary admission of an individual to a facility may be made under this section by the individual, if the individual is 16 years old or older.
(b) The applicant shall:
 (1) Submit a formal, written application that contains the personal information and is on the form required by the [Mental Hygiene] Administration; or
(2) In formally request admission.
 (c) A facility may not admit an individual under this section unless:
(1) The individual has a mental disorder;
 (2) The mental disorder is susceptible to care or treatment;
 (3) The individual understands the nature of the request for admission;
 (4) The individual is able to give continuous assent to retention by the facility; and
(5) The individual is able to ask for release.
Unquestionably, when this provision was first enacted nearly a century ago, only the individual could have authorized his or her voluntary admission to a facility. Later recodifications did not themselves change this outcome.
However, the language in § 10-609 is not to be interpreted in isolation. A statute is not immune from changed interpretation merely because its own text has not changed. Other enactments by the General Assembly might affect the interpretation. The goal is to "try to read statutes in harmony, so that all provisions can be given reasonable effect." Yox v. Tru-Rol Co., Inc.,380 Md. 326, 337, 844 A.2d 1151 (2004). Hence, the construction of a statute, although well-based in the law at the time of the statute's enactment, should not be maintained if the effect of doing so is to frustrate the functioning of other, later enacted statutes.
B. Health Care Agency via Advance Directives
In 1969, the General Assembly enacted Maryland's first durable power of attorney statute. Chapter 4, Laws of Maryland 1969. This statute abrogated the common law rule that, "[w]here an agent-principal relationship exists and the principal thereafter loses the requisite mental capacity, the agency is generally held terminated." Kuder v. United Nat'l Bank, 497 A.2d 1105, 1108
(D.C.App. 1985). Under the 1969 statute, if suitable language were included in a power of attorney, it could become or remain effective after the principal's loss of capacity.
In 1988, an opinion of this Office pointed out that, while the focus of the durable power of attorney statute was undoubtedly on commercial and similar financial matters, this legal instrument could be used to create a health care agency. Thus, we endorsed the concept of a durable power of attorney for health care, under which an individual with capacity designates someone to make medical decisions once the individual is no longer able to do so: "A person (the principal) may use a durable power of attorney to direct an agent (the attorney in fact) to carry out the principal's specific directive concerning medical treatment. . . . Alternatively, a principal may choose to empower the attorney in fact to make all medical decisions on his or her behalf, rather than directing a specific treatment decision." 73 Opinions of the Attorney General 162, 184 (1988).
In 1993, as part of the Health Care Decisions Act, the General Assembly explicitly authorized the use of an advance directive to select one's preferred health care agent and to define the scope of the agent's medical decision making authority: "Any competent individual may, at any time, make a written advance directive appointing an agent to make health care decisions for the individual under the circumstances stated in the advance directive." § 5-602(b)(2).[2] The Health Care Decisions Act itself does not define the authority of a health care agent; rather, the agent's authority exists "under the circumstances stated in the advance directive." Notably, the Act does not restrict an individual from granting the health care agent authority across the range of somatic and psychiatric disorders. By contrast, the Act bars a surrogate decision maker — that is, a family member or friend of the patient who, in the absence of a health care agent, is accorded decision-making authority under a statutory priority list — from authorizing "treatment for a mental disorder." § 5-605(d)(2).[3]
In 2001, the General Assembly sought to encourage planning for future mental health care by means of advance directives. In the preamble to Chapter 267 of the Laws of Maryland 2001, the General Assembly declared that "[a]n advance directive for health care allows an individual, when capable of making an informed decision about health care, to specify services he or she would wish to receive if he or she became incapable of making such a decision in the future or to authorize an agent to make health care decisions on the individual's behalf in such a circumstance." The preamble further endorsed a prior study recommendation "that efforts be made to afford individuals with a mental disorder an opportunity to execute an advance directive for mental health services." In furtherance of this objective, the General Assembly enacted § 5-602.1, which confirms the right of a competent individual to make an advance directive "to outline the mental health services which may be provided to the individual if the individual becomes incompetent," to designate "an agent to make mental health services decisions for the [individual]," or both. § 5-602.1(b) and (d)(1). Significantly, the statute authorizes an advance directive for mental health services to include "the identification of mental health professionals, programs, andfacilities that the [individual] would prefer to provide mental health services." § 5-602.1(d)(2) (emphasis added).[4]
Section 5-602.1(a) contains a definition of "mental health services," in the form of a cross-reference to the definition in § 4-301(i)(1). This definition is a broad one, encompassing "health care rendered to a recipient primarily in connection with the diagnosis, evaluation, treatment, case management, or rehabilitation of any mental disorder." § 4-301(i)(1). The term "treatment," as used in the Mental Hygiene Law, means "any professional care . . . that is given in a facility . . .," among other sites. § 10-101(i). Hence, the General Assembly manifested its understanding that the mental health services that can be addressed by an advance directive, including the designation of an agent "to make mental health services decisions," include services in a facility.
C. Conclusion: Authority to Request Voluntary Admission
Reading these provisions together, we conclude that the reference to the "individual" in § 10-609 should be construed to mean not only the individual acting personally but also the individual acting through an appropriately empowered health care agent. This construction harmonizes the voluntary admission provisions of the Mental Hygiene Law with the later enacted statutes authorizing health care agency. Because it honors the autonomous decision of individuals with mental disorders to rely on their health care agents for a range of care decisions, this construction also is consistent with the State's declared public policy of providing "without partiality care and treatment to citizens who have mental disorders." § 10-102(2).[5]
We recognize that the statute on guardianships of the person provides that "no one may be committed to a mental facility without an involuntary commitment proceeding as provided by law." Annotated Code of Maryland, Estates and Trusts Article ("ET"), § 13-708(b)(2); see also ET § 13-706(a). However, this language does not affect our conclusion for several reasons. This provision is written as an exception in a paragraph otherwise dealing solely with the guardian's authority to decide on the disabled person's place of abode. The section as a whole is an account of the powers that a court may grant to a guardian. In this context, the evident intent is to ensure that the guardianship law is not used to circumvent the involuntary commitment law. This provision of the guardianship law does not address, and should not be construed to apply to, the quite different circumstances of a health care agent acting under the power granted by the individual in an advance directive. Indeed, this provision of the guardianship law could not have been intended to restrict voluntary admission through the mechanism of an advance directive, because it was enacted long before the Health Care Decisions Act. See Chapter 768, Laws of Maryland 1977.
 II Prerequisites to Exercise of Health Care Agent Authority
A. Scope and Validity of Advance Directive
When a health care agent seeks to obtain the voluntary admission of an individual to a facility, the facility should carefully review the content of the advance directive. As discussed above, the scope of authority of a health care agent is determined by the individual. It can be very broad, conveying authority with respect to all health care decisions, or more narrowly circumscribed. It can have exceptions. Consequently, the facility must determine, as an initial step, that the authority to request the patient's admission is within the scope of authority conveyed by the advance directive.
In some situations, the individual who executed the advance directive, observing how the agent is carrying out the authority, may seek to revoke it. Proper revocation of an advance directive would, of course, negate the agent's authority, not just about the proposed admission but in all other respects as well. A potentially difficult issue about revocation is the individual's capacity to do so. Under § 5-604, a "declarant" may revoke an advance directive either in writing or orally, under the procedures specified in that section.[6] A declarant is "a competent individual who makes an advance directive while capable of making and communicating an informed decision." § 5-601(g). A "competent individual," in turn, means an adult or an emancipated minor "who has not been determined to be incapable of an informed decision." § 5-601(f).[7] Thus, the revocation of an advance directive by an individual with a mental disorder must be respected unless the mental disorder has rendered the individual incapable of understanding the nature of the decision to revoke the prior selection of a health care agent and the consequences of doing so.[8]
B. Monitoring the Patient's Situation
The enactment of the Health Care Decisions Act's provisions on advance directives in effect added a new group of potential applicants for voluntary admission, but these provisions did not amend the admission limitations themselves. That is, the limitations on voluntary admission in § 10-609(c) remain in effect. In light of the advance directive provisions, however, these criteria can be satisfied by either the individual personally or the individual's authorized agent.
Consequently, a facility may not agree to the voluntary admission of an individual at the instance of the health care agent, even one appropriately empowered by an advance directive, unless all of the criteria in § 10-609(c) are met: The patient has a mental disorder that is susceptible to care or treatment in the facility, the agent understands the nature of what will happen to the patient as a result of the admission, the agent will be able to give continuous assent to the patient's retention by the facility, and the agent will be able to ask for the patient's release. The facility should gain an explicit commitment from the agent to perform the monitoring implied by the "continuous assent" and "ask for release" provisions. Moreover, the facility should deem the voluntary admission no longer valid if the health care agent is in fact not monitoring the situation sufficiently to exercise these rights in an informed way.
C. Absence of Express Disagreement by the Patient
Only the Health Care Decisions Act authorizes a health care agent to take the "action" of requesting the voluntary admission of an individual to a facility.[9] Section 5-611(e)(2) of the Act provides that "[n]othing in this subtitle authorizes any action with respect to medical treatment, if the health care provider is aware that the patient for whom the health care is provided has expressed disagreement with the action." Therefore, the facility may not accept the request if the patient "has expressed disagreement with the action."
Unlike the prerequisite for revoking an advance directive, a patient need not be competent in order to express disagreement. Not only does this provision, by contrast with the provision on revoking an advance directive, omit any reference to capacity, but its history also makes clear that it was included precisely to protect patients who lack capacity from being coerced, without judicial oversight, into treatment to which they object.[10]
What counts as "expressed disagreement with the action"? The term is not defined, and it was not explained in the Act's legislative history.[11]
The lack of a definition and the reference to a health care provider's "awareness" of the disagreement imply that a facility may exercise reasonable discretion in deciding whether a given statement constitutes express disagreement with the action of voluntary commitment. Sometimes, of course, a patient's verbal expression of disagreement will be clear and unambiguous. For example, if the patient states, "No, I don't want to go into the hospital," that is an expressed disagreement which vitiates, at least temporarily, the agent's authority and prevents the facility from taking the action of admitting the patient. Perhaps the individual will change his or her mind later, but as long as this focused disagreement with the action remains, voluntary admission is not possible.[12]
Yet, a verbal expression might be ambiguous, even if it is negative in tone. For example, the unelaborated words "No, no" might be a lament about poor health or an expression of general unhappiness or frustration, not necessarily an expressed disagreement with the action. Much may depend on the context of the statement and the behavior that accompanies it. If the behavior is cooperative, this fact would support the facility's conclusion that the statement is not an expressed disagreement with the action. Cf. Oregon v. Doran, 893 P.2d 569 (Ore.App. 1995) (cooperative behavior without verbal agreement satisfied requirement that driver "expressly consent" to an alcohol test). On the other hand, ambiguous words coupled with physical resistence to the action must be understood as an expressed disagreement. In that case, the action may not be carried out.
 III Conclusion
In our opinion, a facility that provides treatment for individuals with mental disorders may accept an individual for voluntary admission at the request of a health care agent for the individual if: (1) the health care agent is acting within the scope of his or her authority under a then-effective advance directive; (2) the health care agent will monitor the circumstances of the patient's course of treatment so as to be able to exercise judgment about the patient's retention or release; and (3) the patient does not express disagreement with the voluntary admission.
J. Joseph Curran, Jr. Attorney General
Jack Schwartz Assistant Attorney General
Robert N. McDonald Chief Counsel Opinions and Advice
[1] Unless otherwise indicated, all statutory references are to the Health-General Article of the Annotated Code of Maryland.
[2] A competent individual may also appoint an agent by means of an oral advance directive. HG § 5-602(d). For a discussion about who a "competent individual" is in this context, see note 7 below and accompanying text.
[3] A surrogate is generally empowered to "make decisions about health care" for a patient who is incapable of doing so personally. § 56-05(a)(2) and (c)(1). Although the term "health care" is not defined in the Act, it obviously includes mental as well as physical disorders. If it did not, there would be no reason for the explicit denial to surrogates of the authority over treatments for mental disorders. In our opinion, the term "health care," as used in the Act, extends to the full range of medical and related services aimed at the prevention, diagnosis, or treatment of disease or injury. Cf. § 4-301 (defining "health care," for purposes of the medical records law, to encompass procedures "to diagnose, evaluate, rehabilitate, manage, treat, or maintain the physical or mental condition of a patient . . .").
[4] A "facility" is "any public or private clinic, hospital, or other institution that provides or purports to provide treatment or other services for individuals who have mental disorders." § 10-101(e).
[5] Under § 10-809(b)(4), the Department of Mental Health and Hygiene shall "provide training, sample forms, and information on advance directives for mental health services to assist facilities in compliance with this section." The section includes language calling for assistance to an individual in making an advance directive for mental health services as part of the preparation of an aftercare plan for an individual released from a facility. The Department has carried out this legislative instruction with a sample form, which is available on the Mental Hygiene Administration's Web site. The informational items accompanying the form include the following: "Maryland law does not allow a person to sign another adult into a psychiatric hospital. Therefore, a health care agent may not sign you into a psychiatric hospital." Because we have concluded otherwise, we suggest that this item be deleted from the materials. The Administration may wish to consider regulations addressing the procedures and safeguards needed for this category of voluntary admission.
[6] Revocation may be accomplished by any of the four methods specified in § 5-604(a), including a witnessed oral statement to a health care practitioner.
[7] The term "incapable of making an informed decision," defined in § 5-601(l), focuses on a patient's inability "to make an informed decision about the provision, withholding, or withdrawal of a specific medical treatment or course of treatment." Hence, the definition does not fit well with the distinct issue of inability to make an informed decision about the nature and effect of an advance directive. Nevertheless, that is the relevant decision for assessing capacity to execute or revoke an advance directive.
[8] Even if the individual is determined to be incapable of an informed revocation of the advance directive, the individual's attempt to do so might constitute an "expressed disagreement with the action" of proposed admission. See Part II.C. below.
[9] The 1988 Attorney General's opinion discussed in Part I.B. above interpreted the general durable power of attorney statute as extending to health care agency. In 1993, however, as part of the enactment of the Health Care Decisions Act, the General Assembly amended the general durable power of attorney statute to make clear that it no longer applied "to an instrument or portion of an instrument that is an advance directive appointing a health care agent under [the Act]," which was instead subject solely to the Act's requirements. ET § 136-01(e).
[10] The provision was drawn, nearly verbatim, from the former substituted consent law repealed by the Health Care Decisions Act. In Chapter 591 of the Laws of Maryland 1984, the General Assembly authorized a limited form of substituted consent by family members for the medical or dental care of "disabled individuals," those who lacked decision-making capacity because of a physical or mental disability. The substituted consent, however, "may not be given . . . if the health care provider is aware that the person for whom the health care is proposed has expressed disagreement with the decision to provide health care." Former § 20-107(f)(2).
[11] Nor was it explicated in the text or legislative history of the predecessor substituted consent law.
[12] Similarly, a patient who had not expressed disagreement at the time of admission might do so later, precluding retention on the basis of the agent's consent. The patient's expressed disagreement with the action of involuntary commitment is tantamount to the absence of assent under § 10-609(c)(4). *Page 14